THE PORT JERVIS, MONTICELLO AND NEW YORK RAILROAD
COMPANY, Appellant, *v.* THE NEW YORK, LAKE ERIE AND
WESTERN RAILROAD COMPANY, Respondent.

*It seems* that, under the provision of the General Railroad Act (§ 28, chap.
140, Laws of 1850), authorizing a corporation organized under it " to
intersect, join and unite its railroad with any other railway," upon the
grounds of the company owning the road so intersected and requiring
the latter company " to grant the facilities " needed for the purpose, the
right so provided for is an interest in lands and can only be created by
a written instrument; a verbal agreement attempting to create it is void,
under the Statute of Frauds.

In an action to recover damages sustained by means of the alleged unlaw-
ful severance by defendant of the connection of its railroad with that of
the plaintiff, to compel defendant to restore the connection and to
restrain further interference therewith, it appeared and was found that
the original connection between the two roads was under a temporary
parol agreement between the companies then owning them by which the
owner of plaintiff's road was permitted to make the connection and to use
the tracks, depot, yard and turn-table of the other company without
charge; subsequently fifty dollars per month was charged for such use;
when plaintiff took possession and asked permission of defendant to
make use of the accustomed facilities, permission was granted upon
plaintiff's agreement to pay $100 per month, which was paid.   Defend-
ant thereafter notified plaintiff that, after a date specified, the use of
such facilities could not be continued unless plaintiff would pay $300
per month therefor, which, not having been paid, defendant, after giv-
ing notice to plaintiff to discontinue, itself severed the connection between
the two tracks.   *Held*, that the complaint was properly dismissed.

(Argued March 15, 1892; decided April 26, 1892.)

APPEAL from judgment of the General Term of the Supreme
Court in the second judicial department, entered upon an order
made May 12, 1890, which affirmed a judgment in favor of
defendant entered upon a decision of the court on trial at
Special Term.

This was an action to recover damages from the defendant
for unlawfully severing the connection between its railroad
track and that of the plaintiff at the village of Port Jervis; to
compel the defendant to restore such connection and to restrain
further interference therewith.

On the 2d of September, 1869, the Monticello and Port Jervis Railway Company was organized to construct and operate a railroad from Monticello, in the county of Sullivan, to Port Jervis, in the county of Orange, a distance of about twenty-three miles. The road thus projected was subsequently built, and on the 25th of August, 1875, passed with the rights of the original company, through the foreclosure of a mortgage, to a new corporation organized under the name of the Port Jervis and Monticello Railroad Company. In November, 1886, the road and all its appurtenances was sold by a receiver and conveyed to the plaintiff, which was authorized by its charter to maintain and operate it and also to build an extension thereof.

The defendant is a railroad corporation, operating a railroad extending from the city of New York to Lake Erie, passing through the village of Port Jervis. Said road was owned by the Erie Railway Company from 1868 until 1875, when it passed into the hands of a receiver, and in 1878, it became the property of the defendant through the process of foreclosure.

The Monticello and Port Jervis Railway Company built its own road but did not operate it, having arranged with the Erie Company to manage it and to furnish the rolling stock therefor, in consideration of a certain sum per mile. The track of the former company was connected with one of the tracks of the latter at a point on its land, about 2,200 feet easterly of its passenger station at Port Jervis. The frog for the connection was furnished by the Erie and has been kept in repair by that company and its successors. The trains, after leaving the Monticello road, passed upon the track of the Erie to its passenger and freight station and to its turn-table, where the engines were turned. They also remained in the Erie yard during the interval between their arrival and departure. This method of operation continued until the first of plaintiff's predecessors disappeared through foreclosure proceedings and the second was organized. During this period no charge was made by the Erie Company for the use of its tracks, depot, yard or turn-table. When the Port Jervis and Monticello

Company came into possession it provided its own rolling stock and operated the road itself. It was permitted by the receiver then in charge of the Erie to use the same facilities that had been extended to its predecessor, without charge, except for the use of the turn-table. When the defendant was organized and took possession of the Erie road permission to use its tracks, yard and depot without charge was withdrawn and the sum of $50 per month was charged for such use and, although payment thereof was not exacted owing to the financial condition of the plaintiff's predecessor, it formed a part of the monthly statement of the accounts between the two companies. Certain payments, however, were made by the Port Jervis and Monticello Company to various agents of the defendant at Port Jervis until the sale and reorganization in 1886, when the plaintiff took possession, and thereupon asked permission from the defendant to make use of the accustomed facilities. Permission was granted "under an agreement, whereby the plaintiff was to pay the defendant the sum of $100 per month for such use thereof and was thereafter to make no payments to agents of the defendant for services in connection with the business at Port Jervis." Payments were made at that rate until March, 1888. In the meantime the plaintiff had projected an extension of its road from a point about four miles from Port Jervis to Summitville, where it intended to connect with the Ontario and Western railroad, which was a competitor of the defendant. The plaintiff was notified by the defendant, prior to March 1, 1888, that after that date. use of said facilities could not be continued unless the plaintiff would pay $300 per month therefor. No payment has been made for such use since March, 1888, although the user has continued, except during a short interval, the same as before. June 21, 1888, after a second notice to discontinue had been given, the defendant severed the connection between its track and that of the plaintiff, but on July 20, 1888, the connection was restored pursuant to the terms of a temporary injunction and since then until the trial of this action, the plaintiff has used said facilities, for which it has paid nothing.

The extension to Summitville has been completed and is substantially ready for operation. No written agreement was ever made for the use by the plaintiff or either of its predecessors of the tracks, yard, depot or turn-table in question, with the defendant or its predecessor.

The trial judge, after finding the foregoing facts, in substance, found as conclusions of law, that the right to use the tracks, etc., was an interest in real estate that could be granted by a written instrument only; that the permission to use said facilities, whether with or without charge, was a license revocable at the will of the defendant and that such license having been lawfully revoked, the plaintiff could not maintain this action. The complaint was dismissed without costs, but the temporary injunction was continued for sixty days to enable the plaintiff to move for a commission under the statute to fix the points and terms of connection between the two roads.

The affirmance by the General Term was placed upon the ground that the evidence, which was to some extent conflicting, abundantly sustained the decision of the trial court and that even if it were conceded that an understanding was reached that terminal facilities should be accorded without charge, no time was specified during which that arrangement should continue.

Further facts are stated in the opinion.

*T. F. Bush* for appellant. The original intersection which was established by mutual arrangement between the then existing corporations, was in strict conformity to the statute which created, regulated and defined the rights, privileges and franchises of both corporations. It was a practical location of the terminus of the plaintiff's road, and the rights of the parties were thereby permanently established. The law relating to estates or interests in real property arising out of private contracts, has no application whatever to this case; the whole matter is governed by the Railroad Act. (Laws of 1850, § 28; *In re N. Y., L. E. & W. R. R. Co.*, 44 Hun, 215; *Att.-Gen.* v. *N. A. Ins. Co.*, 82 N. Y. 172; *In re Kerr*, 42 Barb. 119;

*W. A. Co.* v. *Barlow*, 63 N. Y. 70, 71 ; *Schurr* v. *N. Y. S. Ins. Co.*, 41 N. Y. S. R. 90 ; *R., W. & O. R. R. Co.* v. *O. S. R. R. Co.*, 16 Hun, 445.) The oral agreement being fully executed by the Monticello Company, should be enforced in equity. (*Miller* v. *Ball*, 64 N. Y. 291 ; *Freeman* v. *Freeman*, 51 Barb. 306 ; 43 N. Y. 34 ; *Patterson* v. *Copeland*, 52 How. Pr. 460 ; *Schroeder* v. *Wanzer*, 36 Hun, 423 ; *Van Arsdale* v. *Perry*, 21 Wkly. Dig. 116 ; *Willston* v. *Willston*, 41 Barb. 635.) There is nothing in the transaction in the nature of a revocable license. It was manifestly the intention of all parties, and clearly within the contemplation of the statute, that the intersection, when established, should be permanent. ( *Weisman* v. *Lucksinger*, 84 N. Y. 38.) The agreement made in December, 1886, for the payment of $100 per month operated under the statute to fix the right of the plaintiff so long as it performed the agreement. (*R., W. & O. R. R. Co.* v. *O. S. R. R. Co.*, 16 Hun, 445.)

*Lewis E. Carr* for respondent. So far as there was conflict in the testimony, the affirmance by the General Term concluded the plaintiff. Such conflict might be considered by the General Term, but in this court the facts may not be reviewed. (*People ex rel.* v. *French*, 123 N. Y. 636, 637 ; *Flack* v. *Village of Green Island*, 122 id. 107, 117.) The right claimed by the plaintiff is to the permanent and inalienable use of the railroad tracks, yard, station and turn-table of the defendant for the plaintiff's benefit. Such right, if it exists, is an interest in real estate. (*Nellis* v. *Munson*, 108 N. Y. 453 ; Laws of 1881, chap. 293.) Giving full force and effect to the testimony, the logical result from the findings of fact is that such permission as was at any time given to use the defendant's property at Port Jervis was a license which was revocable at the will of the defendant. (*Mumford* v. *Whitney*, 15 Wend. 380 ; *Pitkin* v. *L. I. R. R. Co.*, 2 Barb. Ch. 221 ; *Miller* v. *R. R. Co.*, 6 Hill, 61 ; *Selden* v. *D. & H. C. Co.*, 29 N. Y. 634 ; *Cronkhite* v. *Cronkhite*, 94 id. 323, 328 ; *Wiseman* v. *Lucksinger*, 84 id. 31 ; *Eckerson* v. *Crippen*, 110 id. 585, 591, 592.) The

agreement in November, 1886, for this use for $100 per month rises no higher and gave no additional or more permanent tenure. (*Eckerson Case*, 110 N. Y. 585; *Wiseman* v. *Lucksinger*, 84 id. 31.) There was no agreement on the part of the Erie Company which can be enforced in equity. The right claimed is to the perpetual use of the defendant's real estate. Such a right could not be created by the agreement or act of any officer of the Erie Company. Its origin must be in the agreement or act of the corporation. (*Hoyt* v. *Thompson*, 5 N. Y. 320.) Equity will enforce a parol agreement for an interest in real estate only where special circumstances exist, and the agreement is clear and precise in its terms as to the rights sought to be obtained. Here the agreement is of the most uncertain and indefinite character. (*Wiseman* v. *Lucksinger*, 84 N. Y. 31; *Cronkhite* v. *Cronkhite*, 94 id. 323, 327; *Babcock* v. *Utter*, 1 Abb. Ct. App. Dec. 27.) The fact that the licensee has expended money in constructing works in apparent reliance on the license, furnishes no ground for the enforcement of the agreement for use. (*Babcock* v. *Utter*, 1 Abb. Ct. App. Dec. 27, 28.) The agreement for use of terminal facilities, if ever made, was with the first Monticello Company, and when the scope of the use was enlarged or changed, the Erie Company and its successors were no longer bound by it. (7 Wait's Act. & Def. 205; *Wheelock* v. *Noonan*, 108 N. Y. 179; *Kissicker* v. *Moure*, 36 Penn. 313.) The agreement of November, 1886, was not irrevocable under the statute relating to connections between railroads. The plaintiff is not in a position where it can avail itself of that agreement as one settling the points and terms of connection between the roads of the plaintiff and defendant. (Laws of 1850, chap. 140; 3 R. S. [8th ed.] 1751, § 28; *Williams* v. *R. R. Co.*, 16 N. Y. 97.)

VANN, J. The act under which both parties to this action, and their predecessors, were organized, provides that every corporation formed thereunder shall have power " to intersect, join and unite its railroad with any other railroad before con-

structed, at any point on its route and upon the ground of such other railroad company, with the necessary turnouts, sidings and switches and other connections in furtherance of the objects of its connection." It further provides that " every company whose railroad is or shall be hereafter intersected by any new railroad, shall unite with the owners of such new railroad in forming such intersections and connections and *grant* the facilities aforesaid ; and if the two corporations cannot agree upon the amount of compensation to be made therefor, or the line or lines, the grade or grades, points and manner of such   *   *   *   connections, the same shall be ascertained and determined by commissioners to be appointed by the courts." (L. 1850, ch. 140, § 28 ; 3 R. S. [8th ed.] 1739.)

The learned counsel for the plaintiff claims that pursuant to this statute " upon the construction and completion of the railroad now owned and operated by the plaintiff, in the year 1871 a connection and intersection was made between the said road and the road now occupied and operated by the defendant, by a mutual agreement between the railroad companies then owning said roads respectively, and that it was no part of said agreement that any sum whatever should be paid for the said connection or intersection," and he excepted to the refusal of the trial court to so find upon his request. While it is not claimed that any written agreement was made, it is insisted that by a verbal arrangement, quite indefinite as to terms and details, the plaintiff's predecessor acquired an irrevocable right to use, without compensation, the railroad track, depot, yard and turn-table now owned by the defendant at Port Jervis. Obviously such a right, if it exists, is an interest in real estate, and can be created only by a written instrument, unless, as the plaintiff claims, the Statute of Frauds has no application to the subject. Apparently the statute applies, because such agreements are not expressly excepted from its operation. The word " grant," as used in that part of the Railroad Act already quoted, indicates the nature of the agreement to be made by the two corporations with reference to the intersection

·of their roads.   No other word suggesting the character of the arrangement is used.   If the companies can· agree, the ·established road is to "grant the facilities aforesaid" to the intersecting road.   Moreover, one of the weightiest reasons to justify the enactment of the Statute of Frauds to regulate :agreements between persons, applies with increased force to .agreements between corporations, because, being perpetual, they may survive all the witnesses to any transaction.   It is unnecessary, however, to now decide this question, as the ·court found, in effect, that the agreement under consideration was not permanent, but temporary and "permissive only." If this conclusion was justified by the evidence, it·necessarily ·defeats a recovery by the plaintiff.

The testimony mainly relied upon by the plaintiff was that ·of Mr. Wheeler, the president of the original company during the first year of its existence, and Mr. Ludington, a director. About a month after the first road was organized these gentlemen called on Jay Gould and James Fisk, at that time president and vice-president, respectively, of the Erie Company. Their action was not requested by the board of directors, but was purely voluntary.   Mr. Wheeler testified that they said they could not bond the town of Forrestburg unless they had ·certain pledges in relation to the connection with the Erie road; that such connection, as stated, was "full terminal facilities, to run on their track, have the use of their switches, ·depot, turn-table and everything necessary for passenger and freight business;" that Mr. Fisk, who "did the principal talking,   *   *   *   said they would do it; that we should have these facilities and they would run the road until we were able to put on the rolling stock ourselves, at a very liberal ·charge; that we should have these facilities free of charge;" but repairs were to be paid for.   This was at the first interview, and at the second, about a month later, Fisk inquired ·about the the prospect for tonnage and passenger traffic "in case they helped us build the road," and promised to send an ·expert to examine the quarries and timber land on the route. .He sent a man accordingly, and afterward said he was satisfied

and that "they would do what they could." "It was repeated at every interview I had with him that we should have the terminal facilities free of charge and that they would run the road until we got ready to stock it ourselves, and that then we should have the terminal facilities free of charge." On his cross-examination, Mr. Wheeler omitted the most important part of the various interviews as sworn to by him on his direct, although professing to state all that he could remember. He further testified that while no report was made to the board of directors "the fact that we had obtained these assurances from the Erie Company was communicated to the directors of our company in the way of general conversations with them." No other witness remembered any such agreement as Mr. Wheeler swore to. Mr. Ludington, who was with him at the first interview with Fisk and Gould, thought that it related to getting their consent to bond the town of Deerpark, in which the Erie Company was a large taxpayer, and to obtaining a subscription towards building the road and, in fact, such consent was given and a subscription of $10,000 made. When asked what was said about terminal facilities, he answered : " In all the interviews, which were quite numerous, it was assumed rather than expressly agreed, understood, I cannot express in language how it was understood, there was no written agreement ; they understood our position, and we took the ground that we expected to enjoy these facilities as one of the reasons why the road should go to Port Jervis against such opposition as we had at home, as Judge Low and all of Middletown was against our going to Port Jervis, and I urged this as a reason why they should help us, and they assented to it." When asked to state the substance of the language used, he said: " The substance was we wanted to build a railroad and without their aid we probably couldn't build it. If we had to build the railroad and get our own terminal facilities, turn-table, machine shops, depots, etc., we couldn't build it. That we would probably have to do if we went the other way, because the Oswego road wasn't even graded at that time, and that was one reason why we desired to get a connection with

them." Nothing more definite upon the subject was stated by this witness.

Mr. Dimmick, who was secretary during the first year until September, 1869, and, after that, president until 1875, when the first receiver was appointed, testified that, although he had repeated interviews with Mr. Gould, and was present at all the meetings of the board of directors, he did not remember that anything was ever said in regard to terminal facilities at Port Jervis, and that he " never heard any claim put forward on the part of the Monticello Company that such arrangements had been made until this plaintiff was shut out of the Erie yard in 1888."

Mr. Niven, the vice-president, and Mr. Goodale, a director of the original company during the entire period of its practical existence, both testified to the same effect. It further appeared that it was the expectation at first to lease the new road to the Erie, and as early as July 13, 1869, a committee was appointed for that purpose, but it was finally arranged that it should be run by that company at a stated sum per mile. During the five years that this arrangement continued the terminal facilities were of no practical importance to the Monticello Company, as the Erie was forced to furnish them for its own convenience. When the reorganization came in 1875, a charge for the turn-table was asserted on the one hand and assented to on the other. When the Erie Company was reorganized in 1878, a charge of $50 per month was made for terminal facilities, and there was evidence to support a finding that this charge was assented to. When the plaintiff was organized in 1886, a charge of $100 per month for the use of the same facilities was made by the Erie and for eighteen months was paid by the plaintiff without objection, but in 1888, when the charge was increased to $300, payment for the first month was made under protest, and since then no payment has been made. No action was ever taken by the board of directors of either company relating to the subject of terminal facilities at Port Jervis. Nothing appears upon the minutes kept by the respective secretaries indicating that

the subject was ever reported to or considered by either board.

Much more evidence was given tending to support the theory of the defendant that the original arrangement was merely a temporary expedient to enable a new road to start its trains. The frequent changes in the amount charged also indicates its temporary character. It clearly was within the power of the two roads to enter into a temporary arrangement, and the probabilities support that view. The testimony of Mr. Wheeler is probable only on that theory. It can hardly be conceived that the Erie Company would consent to the use of so much of its property without compensation or conditions, unless it had the power to terminate the arrangement at any time. As long as friendly relations continued between the two roads it did not charge what the use of its property was worth, but when the scope of the use was enlarged and a competing line was introduced into its yard and depot, the charge was increased. It had, however, asserted its right to charge and had from time to time increased the amount, and the plaintiff and its predecessors had assented thereto for thirteen years, or during the entire period that the road was operated by them. The position now taken by the plaintiff is inconsistent with that taken by the owners of its road from the time it was built.

We think that the evidence warranted the findings of the trial court, so far as the question under consideration is concerned, and that the affirmance by the General Term leaves us without power to review them.

The trial court found, as a fact, that about March, 1888, the plaintiff agreed to pay the defendant the sum of $300 per month for the use of said facilities after March, 1888; that the amount so agreed upon was the fair and reasonable value of such use, and that "under such agreement the plaintiff became bound to pay and the defendant became entitled to receive the sum of $300 per month for the use of said facilities so long as the plaintiff continued so use the same." The court also found, as a conclusion of law, " that the agreement of the

plaintiff to pay the sum of $300 per month for the use of said facilities was and is a valid and binding agreement and continues in force and effect so long as such facilities are used, and said agreement is in no wise modified or changed." These findings were duly excepted to by the plaintiff. The judgment entered simply dismissed the complaint and vacated the temporary injunction.

Upon the argument, the counsel for the defendant consented that said findings of fact and law relating to an agreement by the plaintiff to pay $300 per month for the use aforesaid might be stricken from the record and the judgment modified accordingly.

After examining all of the exceptions, we think that the judgment should be modified so as to conform to the consent of counsel, as above stated, and, as thus modified, affirmed without costs.

All concur.

Judgment accordingly.